Edward A. Pennington (*Pro hac vice pending*)
Gregg A. Rapoport (SBN 136941)
SMITH, GAMBRELL & RUSSELL, LLP
444 South Flower Street, Suite 1700
Los Angeles, CA 90071
Tel: (213) 358-7220
Fax: (213) 358-7320
grapoport@sgrlaw.com

Attorneys for Respondent,
XCAST LABS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Petitioner,<br><br>v.<br><br>XCAST LABS, INC.,<br><br>Respondent. | Case No. 2:21-mc-1026−MWF(MRWx)<br>*Hon. Michael W. Fitzgerald*<br><br>**RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND**<br><br>[Declarations of Patricia Mathis, Stephen Nelson, and Edward A. Pennington filed concurrently]<br><br>Date:    [No hearing set]<br>Time:<br>Ctrm:    550<br><br>*Action Filed: August 6, 2021* |

TO THIS HONORABLE COURT AND TO PETITIONER AND ITS

ATTORNEYS OF RECORD:

Pursuant to the Court's August 16, 2021 and September 7, 2021 Orders

(ECF 9 and 14), Respondent XCAST LABS, INC. ("XCAST" or "Respondent")

1  hereby responds to and opposes the Petition for Summary Enforcement of a Civil

2  Investigative Demand (ECF 1) filed by Petitioner, the Federal Trade Commission

3  (the "FTC" or "Petitioner"), on the grounds and defenses set forth in the

4  accompanying points and authorities.

5         XCast hereby reserves and does not intend to waive any right to answer the

6  Petition to the extent it may be required to do so.

7  DATED: September 24, 2021

8
9                                         SMITH, GAMBRELL & RUSSELL,
                                          LLP
10
11                           By:  _____/s/ Edward A. Pennington_____
12                                Edward A. Pennington
                                  Gregg A. Rapoport
13                                Attorneys for Respondent
                                  XCAST LABS, INC.
14

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

# **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................................... 2

    A.  XCast's VoIP Voice Call Termination Business ................................... 2

    B.  XCast's Compliance With the CID ......................................................... 4

        1.  XCast's Initial Efforts to Respond to the CID ............................ 5

        2.  The Remaining Disputes ............................................................ 10

III.  THE CID IS UNENFORCEABLE AS OUTSIDE THE FTC'S JURISDICTION AND AS IMPERMISSIBLY INDEFINITE, OVERBROAD AND UNDULY BURDENSOME ...................................... 11

    A.  The FTC Plainly Lacks Jurisdiction Over XCast's VoIP Voice Call Termination Services, Which are Common Carrier Services Governed by the FCC ............................................................................ 11

    B.  The CID Specifications at Issue are Indefinite, Overbroad And Unduly Burdensome ............................................................................ 16

        1.  Specification No. II.C. ................................................................ 16

        2.  Specification Nos. II.D.1-3, 6-10, and 12 .................................. 19

        3.  Specification No. II.E.4 ............................................................. 21

IV.  XCAST IS NOT BARRED BY ANY EXHAUSTION OF ADMINISTRATIVE REMEDIES REQUIREMENT ................................... 21

    A.  No Exhaustion Requirement Exists in Any Statute or Regulation ....... 21

    B.  The Court May Not Impose a Prudential Exhaustion Requirement ............................................................................................ 23

V.  CONCLUSION ...................................................................................................... 27

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

# **TABLE OF AUTHORITIES**

**Cases**

*CFPB v. Accrediting Council for Indep. Colleges & Sch.*,
   854 F.3d 683 (D.C. Cir. 2017) ........................................................25

*CFPB v. Seila L. LLC*,
   997 F.3d 837 (9th Cir. 2021) ..........................................................24

*Dow Chem. Co. v. Allen*,
   672 F.2d 1262 (7th Cir. 1982) .........................................................11

*EEOC v. Kaiser Found. Hosps.*,
   2019 WL 7494905 (C.D. Cal. 2019), *report and rec. adopted*, 2020 WL
   70885 (C.D. Cal. 2020) ...................................................................22

*EEOC v. Karuk Tribe Housing Auth.*,
   260 F.3d 1071 (9th Cir. 2001 ....................................................11, 25

*EEOC v. Nationwide Janitorial Servs., Inc.*,
   2018 WL 4563053 (C.D. Cal. 2018), *report and rec. adopted sub nom,*. 2018
   WL 4562952 (C.D. Cal. 2018) .........................................................11

*EEOC v. U.S. Fid. & Guar. Co.*,
   414 F. Supp. 227 (D. Md. 1976) ......................................................25

*EEOC. v. Hennepin Cty.*,
   623 F. Supp. 29 (D. Minn. 1985) .....................................................23

*FDIC v. Garner*,
   126 F.3d 1138 (9th Cir. 1997) .........................................................11

*FTC v. AT&T Mobility LLC*,
   883 F.3d 848 (9th Cir. 2018) .....................................................12, 13

*In re Ramirez*,
   905 F.2d 97 (5th Cir. 1990) .............................................................24

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
   849 F.3d 1129 (D.C. Cir. 2017) .......................................................25

*Laing v. Ashcroft*,
   370 F.3d 994 (9th Cir. 1994) ...........................................................26

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) .................................................................22, 23

*McLane Co. v. EEOC*,
   137 S. Ct. 1159 (2017) ....................................................................11

*NLRB v. Fresh & Easy Neighborhood Mkt.*,
   805 F.3d 1155 (9th Cir. 2015) .........................................................23

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

*Ross v. Blake*,
    578 U.S. 632, 136 S. Ct. 1850 (2016) ............................................................22

*Sisley v. U.S. Drug Enf't Admin.*,
    __ F.4th __, 2021 WL 3853049 (9th Cir. 2021) ....................................23, 24

*Student A by & through Parent A v. San Francisco Unified Sch. Dist.*,
    9 F.4th 1079 (9th Cir. 2021).....................................................................22

*U.S. v. Morton Salt Co.*,
    338 U.S. 632 (1950) ...........................................................................11, 16

*U.S. v. Space Expl. Techs. Corp.*,
    2021 WL 2690874 (C.D. Cal. 2021), *report and rec. adopted*, 2021 WL
    2685630 (C.D. Cal. 2021) .....................................................................11

*United States v. McCoy*,
    954 F.2d 1000 (5th Cir. 1992).................................................................17

*United States v. Mostad*,
    760 F. App'x 512 (9th Cir. 2019)...........................................................24

**Statutes**

15 USC § 44 ...............................................................................................12

15 USC § 45 ...............................................................................................12

15 USC § 46 ...............................................................................................12

15 USC § 57b-1 ...........................................................................21, 23, 25, 26

15 USC § 6105 ............................................................................................13

15 USC §§ 6101 et seq. ................................................................................13

16 CFR § 2.1, et seq.....................................................................................23

16 CFR § 2.10.............................................................................................21

16 CFR § 2.7 ..............................................................................................16

16 CFR § 2.9 ..........................................................................................23, 26

16 CFR § 310.1 et seq..................................................................................12

20 U.S.C. § 1415.........................................................................................22

29 CFR § 1601.16 ...................................................................................22, 23

42 U.S.C. § 1997e.......................................................................................22

47 CFR § 42.6.............................................................................................18

47 CFR § 64.6300......................................................................14, 15

47 U.S.C. § 153.............................................................................13

47 U.S.C. § 227.......................................................................13, 14

47 U.S.C. 227b................................................................................14

47 USC § 222..................................................................................19

FRCP 81.........................................................................................17

**<u>Other Authorities</u>**

Wright & Miller, 33 Fed. Prac. & Proc. Judicial Review § 8363 (2d ed.)...............22

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.    INTRODUCTION**

In its zeal to advance the popular cause of protecting consumers from illegal "robocalls" carrying "spoofed" Caller-IDs, the FTC has lost sight of the limits Congress placed upon its regulatory and investigatory authority, as well as all sense of proportion, restraint, and fairness.  The agency has announced:

> "The FTC is determined to stop illegal robocallers, including by holding their service providers accountable," said Andrew Smith, Director of the FTC's Bureau of Consumer Protection. "It is unlawful for VoIP service providers to knowingly provide substantial assistance to illegal robocallers, and we will not hesitate to take action against these companies."  (FTC Press Release (12/5/19).[1]

> "Bombarding people with unwanted robocalls is illegal ...," said Andrew Smith, Director of the FTC's Bureau of Consumer Protection. "We will continue to go after companies like Educare that target people using these unlawful practices, and VoIP service providers like Globex who knowingly help them violate the law."  (FTC Press Release (9/22/20).[2]

While the FTC can and should investigate deceptive or abusive telemarketing acts or practices, it is barred from investigating XCast's "common carrier" activities, which are expressly reserved to the Federal Communications Commission.  The FCC itself has enacted a robust set of laws and regulations to require VoIP "voice call termination" providers such as XCast, and the VoIP industry, to combat illegal robocalls.  XCast is not only fully compliant, but has taken a leadership role within its industry to achieve the FCC's objectives.  The FTC may share those same

---

[1]    https://www.ftc.gov/news-events/press-releases/2019/12/court-halts-operations-voip-service-provider-after-ftc-ohio. XCast requests the Court take judicial notice of this online government notice and others cited below as adjudicative facts, admissible as public records.  (Fed. R. Evid. 201, 803(8).)

[2]    https://www.ftc.gov/news-events/press-releases/2020/09/globex-telecom-associates-will-pay-21-million-settling-ftcs-first.

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

objectives, but it cannot use the CID process to intrude upon the FCC's exclusive jurisdiction.  The CID thus exceeds the FTC's authority and may not be judicially enforced.  (See Part III.A. below.)

The FTC's overreach does not end there.  XCast has at all times sought to cooperate, and the FTC acknowledges that XCast has fully complied with nearly two-thirds of its document and information requests.  The agency has nonetheless refused to engage in meaningful discussions about the remaining 11 specifications, nor even to "provide clarifying information as to their scope, beyond how they are broadly worded in the CID itself."  While the FTC asserts that XCast has caused "significant delay" (FTC Memo. at 1:6-8), it ignores the fact that during three of the five months between service of the CID and the filing of the Petition, the FTC did not communicate with XCast to request further responses, much less to "meet and confer."  The agency's intransigence has continued to this day, even after this Court encouraged it "to continue to work cooperatively to resolve" the matter.  (ECF 14.)

Having refused to compromise or even to clarify its expectations, the FTC cannot enforce the remaining specifications at issue, which are indefinite, overbroad, or unduly burdensome.  (See Part III.B below.)

Finally, the agency cannot sidestep the standards for enforcement by claiming that "XCast has waived any challenge it may have made to the CID because it chose not to avail itself of the Commission's administrative process for contesting the validity of a CID."  (FTC Memo. at 4:26 - 5:1; Pet. ¶ 48.) To the contrary, there is no exhaustion rule that applies here, as discussed in Part IV below.

The FTC's Petition should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   XCast's VoIP Voice Call Termination Business

Established in 2002, XCast is a privately held company whose business falls into two distinct categories.  The first category is XCast's provision to business

customers of a PBX hosted software platform,  also referred to as software as a service (SaaS), and SIP trunking.   (Mathis Decl. ¶ 3 and detailed footnotes thereto.)

The second category, relevant here, is XCast's provision of "wholesale voice call termination services" to other carriers and call center customers as resellers of VoIP services, to enable them to send high quality voice data that they route to end users within calls trafficked via multiple carriers.  The calls may terminate at the recipient's digital telephone or at the recipient's other call-receiving devices.  That call termination point is where the end recipient of a robocall might see a "spoofed" Caller-ID.  (*Id*. ¶ 4 and detailed footnote thereto.)

Most of these services are marketed by XCast through, and largely provided by, commercial white-label resellers and marketing partners. XCast's business model does not involve servicing end-user subscribers.  (*Id*. ¶ 5.)

For the last several years, the Federal Communications Commission has overseen and regulated internet voice call termination services as a common carrier service in its effort to combat "robocalls" using "spoofed" Caller-ID telephone numbers, which are illegal under Section 227(e) of the Communications Act of 1934 (47 U.S.C. § 227(e).).  (*Id*. ¶¶ 6-12.)  (See Part III.A. below.)

XCast's 27 officers and employees are officially assigned to its offices in Century City (corporate headquarters and record-keeping), Fairfield, Iowa (billing and database), and Chicago (engineering) offices, as well as other remote locations for various executive, account management and support personnel.  (*Id*. ¶ 14.)

All XCast employees have been working from home since XCast shuttered their offices in March 2020 due to COVID-19 restrictions.  For the past ten years, XCast's Senior Vice President of Operations, Stephen Nelson, has been the person primarily responsible for, and most involved in, responding to subpoenas XCast has received from law enforcement and other government agencies.  (Nelson Decl. ¶ 4.) Neither Mr. Nelson no other XCast employees have had the ability to gain access to and assemble the company's electronic storage media or paper files, or perform

searches of that material, in a comprehensive manner.  (Mathis Decl. ¶ 15; Nelson Decl. ¶ 19.g.)

### B.   XCast's Compliance With the CID

On January 8, 2021, the FTC issued its CID seeking 29 categories of requested records and information (or "specifications"), relating to a time period beginning January 1, 2018 and relating in part to <u>two</u> specified "Subject Customers or Subscribers" associated with four names.  (Pet. Exh. B.)

The FTC was initially unable to complete service of the CID because XCast's corporate headquarters in Century City were closed and its employees were working from home due to COVID-19 restrictions.  On January 26, 2021, XCast's Senior Vice President of Operations, Stephen Nelson, acknowledged receipt of an emailed copy of the CID and agreed to accept service by mail to his home.  (Pet. Exh. A (Williams Decl.) ¶¶ 8, 13-17; Pet. Exh. D; Nelson Decl. ¶ 5.)

In the meantime, Mr. Nelson attempted to contact the FTC's investigator, Amber Williams, as directed in the CID's cover letter.  (Nelson Decl. ¶ 6; Pet. Exh. B.)  On or about February 5, 2021, he received a call from the FTC's counsel, Valerie Verduce.  Mr. Nelson informed Ms. Verduce that he was confused about the vagueness and scope of the CID as compared to the many subpoenas he had reviewed and to which he had responded on behalf of XCast over the previous ten years.  Mr. Nelson further indicated that the burden of the review and production of records on the two identified customers over a more than three-year period would be substantial,[3] and that he was concerned about XCast's ability to disclose private details about internal personnel matters, operations and ownership of a privately held company.  In response, Ms. Verduce stated that she agreed that the CID's scope

---

[3]     The burden was particularly heavy for Mr. Nelson, who his own personal COVID-related health restrictions and substantial personal family obligations.  (Nelson Decl. ¶ 19(g).)

was broad and that, as a result, she would endeavor to obtain additional time for XCast to respond.  (Nelson Decl. ¶ 7.)  Although Mr. Nelson is not an attorney, and although Ms. Verduce had no reason to believe otherwise, she did not indicate the need for XCast to have counsel participate in discussions regarding the CID.  (*Id.* ¶ 8.)

On February 8, 2021, the FTC agreed to extend XCast's response deadline to March 10, 2021.  (Pet. ¶ 18; Pet. Exh. E.)

### 1.   XCast's Initial Efforts to Respond to the CID

Immediately after his call with Ms. Verduce, Mr. Nelson began attempting to collect the information he understood was being requested for the two customers identified in the CID.  (Nelson Decl. ¶ 9.)  He immediately reached out to XCast's small billing staff, which is located in Iowa, and asked them to begin retrieving any call detail records (CDR) accessible to them for the two customers identified in the CID.  (*Id.*)  The Iowa employees did not have access to all of XCast's CDR, however, because such records typically are stored on a cloud-based server for only 120 days beyond the current billing cycle, and because XCast does not routinely retain records for more than 18 months, as required by the FCC.  (*Id.* ¶ 10.)

After assembling what records and information he could, based on his understanding of the CID, on March 8, 2021, he made XCast's first production of documents and provided a narrative response.  (*Id.* ¶ 11, 19.a.; Mathis Decl. ¶¶ 17-26; see Part III.B below.)

On March 16, 2021, Ms. Verduce asked Mr. Nelson to participate in a follow-up discussion regarding XCast's response.  Mr. Nelson immediately set up a conference call, in which he and Susan Kelley (XCast's Executive Vice President for Business Development) participated, along with Ms. Verduce and Ms. Williams of the FTC.  (Nelson Decl. ¶ 12.)  Mr. Nelson and Ms. Kelley expressed a desire to fully cooperate to the extent legally allowed consistent with their company's

cooperative approach to subpoena responses over the past ten years.  (*Id.* ¶ 13.)  At Ms. Verduce's request, Mr. Nelson explained certain aspects of XCast's initial response and agreed to make further efforts to confirm that CDR information XCast had provided in fact related to the two customers named in the CID.  (*Id.* ¶ 14.)

Ms. Verduce then asserted, to Mr. Nelson's surprise, that XCast had not completely responded to the CID, and insisted that XCast must be aware of customer complaints or claims made through the Better Business Bureau.[4]  (*Id.* ¶ 15.)  Mr. Nelson and Ms. Kelley both indicated that they were not aware of such claims or any wrongdoing by XCast, and that they understood the scope of the CID had included only the two customers named therein.  (*Id.*)  However, Ms. Verduce stated that this was incorrect, and for the first time stated that she wished to speak with XCast's attorney, asserting that anyone with a legal background would understand what the FTC wanted.  Ms. Verduce then abruptly ended the call.  (*Id.* ¶ 16.)

On March 17, 2021, XCast produced additional material, including IP addresses and payment-related information.  (Pet. ¶ 23; Pet. Exh. G at 61; Nelson Decl. ¶ 17.)

On March 22, 2021, XCast's counsel, Mr. Pennington, spoke with Ms. Verduce and Ms. Williams.  (Pennington Decl. ¶¶ 2-3.)  As memorialized in his detailed March 26, 2021 letter (Pet. Exh. F), Mr. Pennington confirmed that while XCast believed it had complied with the CID to the extent allowed by law, it was also willing to continue to provide available information where FTC believed it necessary, consistent with XCast's history of working to achieve the goals of the FTC and the FCC in protecting consumers from unwanted, illegal robocalls and

---

[4]    Contrary to the FTC's apparent belief, XCast has never possessed any document relating to, nor become aware of, any complaints by the Better Business Bureau or any consumer advocacy group about XCast's business operations, including complaints, if any, that might come through resellers. (Nelson Decl. ¶ 13.)

spoofed calls, and to the extent not prohibited by law.  After 20 minutes, Ms. Verduce abruptly hung up from the call, and Mr. Pennington did not hear back from her.  (*Id*. ¶ 3.)

On April 9, 2021, Mr. Pennington received a letter from the FTC's counsel, Allen Dreschel, who stated that he took issue with XCast's responses to <u>all</u> of the CID Specifications, and further asserted that XCast had waived legal objections by not filing a petition to limit or quash the CID and even had "forgone the opportunity to continue to confer with the FTC about the burdensomeness of the CID." (Pet. Exh. G.)

On April 13, 2021, Mr. Pennington responded by letter, explaining XCast's difficulties in responding and taking issue with the FTC's problematic approach to communicating with XCast regarding the requirements of the CID.  (Pet. Exh. H.) Nevertheless, Mr. Pennington stated that XCast would continue its best efforts to work with the FTC and respond with additional information.  (*Id*. at 69.)

On April 15, 2021, Mr. Dreschel responded by letter, asserting that during the calls on February 8, March 16, and March 22, 2021, XCast and its counsel had the opportunity "to ask clarifying questions about the CID," and denied that Ms. Verduce had been unprofessional.  (Pet. Exh. I at 71.)

On April 19, 2021, Mr. Pennington responded by letter, reiterating that XCast "is still working under the same extreme and truly extraordinary circumstances I have previously described in substantial detail," and that "XCast has always been willing to cooperate but has struggled to have the FTC understand what it has, and what it does not have, and what its legal obligations are."  (Pet. Exh. J at 73, 76.) Mr. Pennington disputed Mr. Dreschel's characterization of the March 16, 2021 conference call as a good faith "meet and confer" opportunity for XCast to obtain clarification.  (*Id*. at 76.)  He informed Mr. Dreschel that XCast had decided "that its commitment can best be expressed by providing you full online access to certain of its internal records," and for that purpose had "established a unique portal for FTC's

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

sole use that will be available only to your investigative team for a limited period of time," which "should enable the Commission to answer any other general business questions that remain unanswered." (*Id*. at 74, 76, 78.)  Mr. Pennington further provided extensive additional CDR information, as Mr. Nelson had promised to provide during the March 16, 2021 conference call.  (*Id*. at 74-76.)

XCast heard nothing further from the FTC at the time or for nearly three months thereafter, and assumed that by providing its responses as well as online records access to the FTC, XCast had discharged its obligations.  (Pennington Decl. ¶ 4.)

The next contact XCast received from the FTC was nearly three months later, on July 13, 2021,[5] when Mr. Dreschel sent Mr. Pennington a letter stating:

> Pursuant to 16 C.F.R. § 4.10(g), I write to provide XCast with notice that information XCast provided to the Federal Trade Commission in response to the above-referenced Civil Investigative Demand may be disclosed in a federal court action. Disclosure will be limited to information that is relevant and material to the proceeding.

(Pennington Decl. ¶ 5 and Exh. A thereto.)  The letter did not indicate that the FTC was dissatisfied with XCast's responses to the CID, let alone that it intended to file a petition to enforce the CID.

On July 26, 2021, Mr. Dreschel wrote another letter, as a "brief follow up to my letter of July 13, 2021 ... to clarify that the Federal Trade Commission intends to file an action in the U.S. District Court for the Central District of California seeking summary enforcement of the Civil Investigative Demand issued to XCast and dated January 8, 2021." (*Id*. ¶ 6 and Exh. B.)

---

[5] Curiously, the FTC ignores this three-month gap, asserting that "FTC staff have attempted to work cooperatively with XCast for months after XCast missed its production deadline." (FTC Memo. at 11:22-23.)

On July 28, 2021, Mr. Pennington and Mr. Dreschel further discussed XCast's responses to the CID.  (*Id*. ¶ 7.)  XCast produced additional responses and materials on August 2.  (*Id*. ¶ 8.)

On August 6, 2021, the FTC filed its Petition.  (ECF 1.)  On August 9, 2021, the Court ordered a videoconference "for a discussion and planning session with the lawyers before setting a briefing schedule on the petition."  (ECF 6.)  On August 9, 2021, the Court conferred with counsel and ordered the FTC to file a status report by August 30, 2021, with XCast's opposition to the Petition due by September 13, 2021.  (ECF 9.)  On September 7, 2021, the Court extended XCast's deadline to September 24, 2021.  (ECF 14.)

XCast produced additional responses and materials on August 11, 23, and 24, and on September 20, 2021.  (Pennington Decl. ¶ 8.)

On September 21, 2021, Mr. Pennington sent a letter to Mr. Dreschel asking him as follows:

> Over the past few days, my office has been providing further responsive material to the FTC, even as XCast has been working to meet its Friday deadline to respond to the FTC's Petition.  As of September 9, the FTC's position was that "the outstanding specifications include II.C, II.D.1-3, 6-10, 12, and II.E.4."  In an effort to streamline XCast's response, would you please confirm whether or not the FTC still believes all 11 of these specifications are outstanding?

> And further, to the extent the FTC does believe specifications remain outstanding, I would again request that you provide clarifying information as to their scope, beyond how they are broadly worded in the CID itself.  For example, after XCast provided responses to Nos. II.D.1-3, 6-10, and 12, the FTC alleged only that "XCast produced a trivial amount of responsive material," and that "XCast has provided no response or an evasive response ...."  (Pet. ¶¶ 40-42; Pet. Ex. A (Williams Decl.) at ¶¶ 23-24.).  Will the FTC narrow the scope of these requests to potentially aid XCast's efforts to perform further searches by providing any specific customer or subscriber names, phone numbers, domains, IP addresses, or other identifying information?

(Pennington Decl. ¶ 9 and Exh. C.)  Mr. Dreschel responded that evening by email, stating:

> I'll get you a formal response in due course; in the meantime, I can confirm that the specifications you referred to in the letter remain outstanding.

(*Id.*)  On September 23, 2021, Mr. Dreschel sent Mr. Pennington a letter stating:

> I can confirm that specifications II.C, II.D.1-3, 6-10, 12, and II.E.4 remain outstanding. The FTC will not narrow the scope of these requests at this time. If you have particular questions about the scope of these specifications, I will entertain those by phone, letter, or any method that may be convenient.

(*Id.* ¶ 10 and Exh. D.)  Immediately thereafter, however, Mr. Dreschel emailed Mr. Pennington stating:

> Just wanted to let you know as a courtesy that I'm mostly out of the office for the rest of the week. My ability to respond to emails and phone calls will be delayed as a result.

(*Id.* and Exh. E.)

On September 24, 2021, Mr. Pennington sent a letter to Mr. Dreschel  with a supplemental response to the CID Specification No. II.E.4, and requested that he "confirm that this resolves any remaining dispute regarding this Specification, as alleged in paragraph 45 of the Petition."  (*Id.* ¶ 11 and Exh. F.)  As of the close of business when this brief was finalized, Mr. Pennington had not heard back from Mr. Dreschel.  (*Id.* ¶ 12.)

### 2.   **The Remaining Disputes**

The FTC contends that XCast has not fully complied with 11 of the 29 specifications.  XCast's efforts to comply with these specifications are detailed in the Declarations of Patricia Mathis, Stephen Nelson, and Edward A. Pennington, all filed herewith.  These efforts are summarized in Part III.B below.

## III.   THE CID IS UNENFORCEABLE AS OUTSIDE THE FTC'S JURISDICTION AND AS IMPERMISSIBLY INDEFINITE, OVERBROAD AND UNDULY BURDENSOME

On a petition to enforce an agency's CID, as with an administrative subpoena, the district court must first determine "whether Congress has granted the authority to investigate." (*EEOC v. Karuk Tribe Housing Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001).)  The court must then determine "whether procedural requirements have been followed; and ... whether the evidence [sought by the subpoena] is relevant and material to the investigation." *Id.*  The agency bears the initial burden to establish these elements.  (*FDIC v. Garner*, 126 F.3d 1138, 1143 (9th Cir. 1997).)  Put differently, the agency must show that its "inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." (*U.S. v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *McLane Co. v. EEOC*, 137 S. Ct. 1159, 1163 (2017); *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1269 (7th Cir. 1982) ["the degree of burden is an aspect of reasonableness"].)[6]

### A.   The FTC Plainly Lacks Jurisdiction Over XCast's VoIP Voice Call Termination Services, Which are Common Carrier Services Governed by the FCC

"Although a party may not avoid an administrative subpoena on the ground that it has a valid defense to a potential subsequent lawsuit, such a challenge may, in limited circumstances, be mounted when the defense raised is 'jurisdictional' in nature—i.e., when the agency lacks jurisdiction over the subject of the investigation." (*Karuk Tribe Housing Auth.*, 260 F.3d at 1076–77 [overturning enforcement of subpoena based on lack of jurisdiction over Indian tribe].)

---

[6]     This Court applied these standards in *EEOC v. Nationwide Janitorial Servs., Inc.*, 2018 WL 4563053, at *2 (C.D. Cal. 2018), *report and rec. adopted sub nom,.* 2018 WL 4562952 (C.D. Cal. 2018); and in *U.S. v. Space Expl. Techs. Corp.*, 2021 WL 2690874, at *2 (C.D. Cal. 2021), *report and rec. adopted*, 2021 WL 2685630 (C.D. Cal. 2021).

In its Petition and supporting memorandum, the FTC summarily asserts its purported investigative authority under the Section 5 of the FTC Act (15 USC § 45) and the FTC's Telemarketing Sales Rule (16 CFR § 310.1 et seq.).  (Pet. ¶¶ 7, 9-10; FTC Memo. at pp. 7-8.)  Those provisions empower the FTC to enforce prohibitions against unfair or deceptive acts or practices in or affecting commerce, and deceptive or abusive telemarketing acts or practices.  The FTC asserts its further authority to enforce its CID issued "as part of a law-enforcement investigation into whether certain persons or entities have initiated large volumes of illicit phone calls with prerecorded telemarketing messages ('robocalls')."  (Pet. at 2:4-8.)  The FTC states that its "investigation seeks to determine whether unidentified persons or entities are involved in the initiation of" such calls, and that the information sought in the CID "bears directly on the Commission's inquiry into suspected illicit robocalling and telemarketing activity." (FTC Memorandum, ECF 1-1 at pp. 1, 10, 11.)  The Petition identifies XCast as a VoIP voice services provider whose "technology allows users to place and receive phone calls using an internet connection rather than a traditional telephone line."  (ECF 1 at ¶ 8.)

The FTC does not address the fact that under Sections 5 and 6 of the FTC Act (15 USC §§ 45 and 46), the FTC's enforcement and investigatory authority over "unfair or deceptive acts or practices" expressly exempts "common carriers subject to" the Interstate Commerce Act (ICA) and the Communications Act of 1934, i.e., telecommunications providers whose activities fall under the FCC's jurisdiction.  15 USC §§ 44, 45(a)(2), and 46(a).  As the Ninth Circuit has recognized:  "Congress did not intend the FTC to regulate common-carrier business practices, ... because the Interstate Commerce Act had already delegated that role to the ICC.  Hence, Congress established Section 5's common-carrier exemption to avoid interagency conflict."  (*FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854-855 (9th Cir. 2018).)

The Communications Act defines "common carrier" to include "any person engaged as a common carrier for hire, in interstate or foreign communication by

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

wire or radio or interstate or foreign radio transmission of energy," including "telecommunications carriers" to the extent that they are engaged in providing telecommunications services.  (47 U.S.C. § 153(11), (51); *AT&T*, 883 F.3d at 855-856, 860 ["a company may be an interstate common carrier 'in some instances but not in others, depending on the nature of the activity which is subject to scrutiny.' ... '[w]hether an entity in a given case is to be considered a common carrier or [not] turns on the particular practice under surveillance.'" (Citations omitted.)].)

The common carrier exemption from FTC oversight is recognized in the Telemarketing Sales Rule and the underlying Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 USC §§ 6101 et seq., which by their terms do not affect activity "outside the jurisdiction" of the FTC Act.  (15 USC § 6105; 60 Fed. Reg. 43842, 43843 (1995) [stating that the Rule does not cover activity beyond the jurisdiction of the FTC Act].)

Under the common carrier exemption, the FTC has no authority over VoIP voice providers with regard to their role in detecting spoofed robocalls.  Instead, as Congress recently recognized, the FCC is the agency with specific authority to impose rules on providers of VoIP voice services to further the detection and mitigation of "spoofed" robocalls, which are illegal under Section 227 of the Communications Act of 1934.  (47 U.S.C. § 227(e).).

For the last several years, the FCC has overseen and regulated internet voice call termination services as a common carrier service in its effort to combat "robocalls" using "spoofed" Caller-ID telephone numbers, which are illegal under Section 227(e) of the Communications Act of 1934 (47 U.S.C. § 227(e).).  (Mathis Decl. ¶¶ 6-12.)  In November 2018, XCast received a letter from the FCC encouraging XCast "to cooperate with the USTelecom Industry Traceback Group's program aimed at identifying the source of illegal robocalls and harmful spoofed calls," and "to take measures to prevent the flow of illegal traffic."  (Mathis Decl. ¶ 8 and Exh. A thereto.)  The USTelecom Industry Traceback Group (or "ITG") is a

trade association group of approximately 30 voice service providers that are collaborating to lead the industry's efforts to actively trace and identify the source of illegal robocalls.  (*Id.* ¶ 7.)

In December 2019, Congress passed the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (the "TRACED Act"), Public Law 116-105, which directed the FCC to adopt rules requiring providers of VoIP voice services to implement an a robocall mitigation system, or "authentication framework," known as STIR/SHAKEN (short for "the secure telephone identity revisited and signature-based handling of asserted information using tokens standards."  (TRACED Act § 4, 47 U.S.C. 227b; 47 CFR § 64.6300(j).)[7] (*Id.* ¶ 9.) This technology "allows voice service providers to authenticate and verify caller ID information for calls carried over IP networks."[8] The TRACED Act requires the FCC merely to consult with the FTC before reporting its enforcement activities to Congress, and to participate in an interagency working group with the FTC and other agencies.  (TRACED Act §§ 3(h) and 5(c), 47 USC § 227(h).)

The FCC's implementing rules for the STIR/SHAKEN framework, set out at 47 CFR § 64.6300 et seq., require XCast, in providing its wholesale termination services, by June 30, 2021, to:  "Authenticate caller identification information for all calls it receives for which the caller identification information has not been authenticated and which it will exchange with another provider as a SIP call, except that the intermediate provider is excused from such duty to authenticate if it:  (1) Cooperatively participates with the industry traceback consortium; and (2) Responds fully and in a timely manner to all traceback requests it receives from the Commission, law enforcement, and the industry traceback consortium regarding

---

[7]     *See* https://docs.fcc.gov/public/attachments/DOC-368981A1.pdf; https://docs.fcc.gov/public/attachments/DOC-368957A1.pdf.

[8]     *See* https://docs.fcc.gov/public/attachments/DOC-368981A1.pdf at 3.

1   calls for which it acts as an intermediate provider."  (47 CFR §§ 64.6300(e),

2   64.6301(a) , 64.6302(b) .)  (*Id.* ¶ 10.)

3        Among its other robocall mitigation measures, XCast cooperatively

4   participates with and responds to traceback requests its receives from the ITG,

5   which is the FCC's chosen industry traceback consortium.[9]  XCast joined the ITG in

6   or about late 2019 and, by late June 2021, had joined the ITG's steering committee,

7   had fully implemented the FCC's STIR/SHAKEN framework for its wholesale

8   voice termination services, and had received certification of its compliance pursuant

9   to 47 CFR § 64.6305(b).[10]  (*Id.* ¶ 11.)

10        The FCC continues to update the STIR/SHAKEN framework requirements

11   through its rulemaking process,[11] and XCast spends much of its resources in its

12   efforts to adapt its systems and documentation to comply.  (Mathis Decl. ¶ 12.)

13        Because XCast's VoIP voice call termination services are subject the FCC's

14   robocall mitigation rules, these services constitute an activity falling within the

15   common carrier exemption, putting these services plainly outside the FTC's

16   investigatory authority and jurisdiction.

17        The FTC ignores this issue entirely in its Petition and supporting

18   memorandum, and thus fails to carry its initial burden to establish its own authority

19   to investigate XCast.  Accordingly, the Petition should be denied.

20

21

22

23

24

---

25      [9]    *See* https://www.fcc.gov/document/fcc-retains-industry-traceback-group-robocall-consortium.

26      [10]    *See* https://authenticate.iconectiv.com/authorized-service-providers-authenticate.

27      [11]    *See, e.g.*, https://docs.fcc.gov/public/attachments/DOC-374693A1.pdf and

28   https://docs.fcc.gov/public/attachments/DOC-372025A1.pdf.

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

**B.**     **The CID Specifications at Issue are Indefinite, Overbroad And Unduly Burdensome**

The FTC describes the 11 specifications remaining at issue in its Petition as seeking "certain customer and subscriber correspondence," as well as "<u>certain XCast business records</u>," responses to "general business interrogatories."  (Pet. ¶ 33.)  In fact, the specifications do not with any "certainty" identify the correspondence and records the FTC is expecting be produced, as required by 16 CFR § 2.7(b) ("CIDs ... shall describe each class of material to be produced with sufficient definiteness and certainty as to permit such material to be fairly identified....") and by the courts.  (*Morton Salt Co.*, 338 U.S. at 652.)

Instead, the FTC refuses to clarify and narrow its requests, and has largely refused to disclose why it considers XCast's responses to be deficient or evasive. Having responded at length, both before and after the Petition's filing, XCast remains largely in the dark as to the FTC's focus of inquiry and the basis for its position.

**1.**     **Specification No. II.C.**

Specification No. II.C. requests all "Customer or Subscriber  Correspondence ... relating to each Subject Customer or Subscriber or <u>any other customer or subscriber</u> Identified in any of Your responses to <u>any complaints, subpoenas, civil investigative demands, or inquiries</u> from telecommunications companies, providers of [VoiP] services, or government agencies about unlawful telemarketing, autodialed telephone calls, calls delivering prerecorded messages, calls to numbers listed on the National Do Not Call Registry, or calls using spoofed caller ID numbers."  The term "Customer or Subscriber Correspondence" is further defined to include:

> Documents, such as complaints and Your responses to such complaints, that You directly or indirectly received from or sent to a customer or subscriber, including <u>any complaints or inquiries</u> to or by Better

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

1
2
Business Bureaus or government agencies, and Your responses to those complaints or inquiries."

3 The term "Document" is then defined to mean originals, drafts, and copies or "any

4 item" subject to discovery by the FTC.  (Pet. Exh. B at pp. 28, 30 [emphasis

5 added].)

6 The FTC alleges that XCast's responses were "severely deficient" because

7 "XCast only provided one document in response to the specification that seeks

8 several categories of XCast's customer and subscriber correspondence."  (Pet. ¶¶34-

9 35 [emphasis added].)  After the Petition was filed, XCast made a good faith effort

10 to further respond, providing various records relating to the subscriber accounts that

11 were in fact specifically identified in the CID.  (Nelson Decl. ¶¶ 9-11, and 19.)

12 As to other, unspecified accounts, XCast is unable to provide further material

13 for several reasons.  First, although XCast repeatedly sought clarification of this

14 indefinite request, the FTC has refused to narrow its scope or provide specific

15 identifying information that XCast might be able to use for further records

16 searching, apart from engaging in perfunctory and brief "meet and confer" calls.

17 (Pennington Decl. ¶¶ 3-12.)  And, contrary to its assertion, the request is not limited

18 to "a small number of XCast customers."  (FTC Memo. at 11:6-7.)  The FTC's lack

19 of cooperation and candor with XCast, a small private company, suggests it is on a

20 fishing expedition to try to detect potential violations within XCast's records,

21 without a realistic expectation of that something might be discovered.[12]

22
23
24

25 [12]    As the FTC acknowledges, Rule 81(a)(5), Fed. R. Civ. P. "give[s] district courts discretion
in a wide variety of subpoena enforcement proceedings to tailor the Federal Rules to the particular needs
26 and purposes of the proceeding."  *United States v. McCoy*, 954 F.2d 1000, 1004 (5th Cir. 1992).  Here,
Rule 26(b) limits discovery to that which is not only "relevant," but "proportional to issues at stake in the
27 action, the amount in controversy, the parties' relative access to relevant information, the parties' resources,
the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed
28 discovery outweighs its likely benefit."

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

Second, XCast has never had a reason to systematically catalogue its communications with resellers, agents, and others relating to possible spoofing incidents.  These would be stored, if at all, in different electronic and hardcopy venues.  (Nelson Decl. ¶ 19.e.)

Third, XCast has no company policy that requires retention of records beyond the 18-month period prescribed by the FCC.[13]  (Nelson Decl. ¶ 19.f.)

Fourth, it is true that XCast's billing records are readily available during a 120-day billing cycle and thereafter archived as appropriate.  (*Id*.)  Assuming there were any responsive call record data still existing on XCast storage media, Mr. Nelson is the person who would manage the collection project, working with the engineering personnel capable of locating, retrieving, and assembling the media.  He does not have the ability to do that work because:  (1) the company's physical offices in Century City, Chicago, and Fairfield Iowa remain shuttered due to COVID restrictions; and (2) his own personal COVID-related health restrictions and substantial personal family obligations preclude him from traveling.  (*Id*. ¶ 19.g.)  Further, this work would consume all of Mr. Nelson's time and make it impossible for him to perform his many other critical roles in the company, including daily carrier-relations management and rate negotiation, managing vendor-partner relationships under STIR/SHAKEN, representing XCast on the ITG, managing all facilities, implementing billing and taxation projects involving outsourced providers, managing acquisitions of numbers from vendors, negotiating equipment procurement, serving as the contact with the company vendors who host its secure co-located network servers, managing vendor billing disputes, and fielding and responding to other subpoenas.  (*Id*. ¶¶ 3-4 and 19(h).)

---

[13]   47 CFR § 42.6.

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

Fifth, assuming the call record data could be located, retrieved, and assembled, it would take XCast employees hundreds of hours to perform searches, review results, and redact records in accordance with the FTC's specifications and XCast's obligations under federal law to protect the privacy of these records.[14]  (*Id.* ¶ 19.i.)  On the other hand, to the extent XCast is given specific and narrow terms to search, it could potentially be able to perform searches and perform appropriate redactions, once it gains access to the storage media and paper files.  (*Id.* ¶ 19.j.)

## 2.   Specification Nos. II.D.1-3, 6-10, and 12

The FTC itself describes the nine outstanding specifications under Nos. II.D as broadly calling for "all documents that pertain to multiple aspects of XCast's operations."  (Pet. ¶ 41.)  These requests call for:

"all complaints from any other telecommunications company, provider of VoIP services, individual consumer, or any other third party about calls originated by the Company; and your responses to those complaints."  (I.D.1.)

"all internal documents related to training employees of the Company on addressing or responding to complaints from any other telecommunications company, provider of VoIP services, individual consumer, or any other third party about calls originated by the Company." (II.D.2.)

"all government inquiries, letters, civil investigative demands, and subpoenas about calls originated by the Company; and all responses to such inquiries, letters, civil investigative demands, and subpoenas."  (II.D.3.)

---

[14]     XCast would need to properly redact information in customer data records that is protected under federal law.  Section 222 of the Communications Act of 1934, 47 USC § 222(a), provides that every telecommunications carrier "has a duty to protect the confidentiality of proprietary information <u>of, and relating to</u>, ... <u>customers</u>, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier."  This "customer proprietary network information" (CPNI) includes "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship."  (47 USC § 222(h)(1).)  The FCC's regulations under this law, 47 CFR § 64.2001 et seq., confirm that this law applies to entities that provide "interconnected VoIP services."  (47 CFR § 64.2003(o); 47 CFR § 9.3.)

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

"all internal documents related to training employees of the Company on compliance with the Telemarketing Sales Rule, 16 C.F.R. § 310 et seq., and other state and federal laws that regulate any of the following: telemarketing; autodialed calls; calls to numbers on the National Do Not Call Registry; calls delivering prerecorded messages; calls using spoofed caller ID numbers." (II.D.6.)

"all internal communications, retained for Your business purposes, in which employees of the Company discussed or mentioned calls originated through the Company's VoIP lines that were placed to numbers listed on the National Do Not Call Registry." (II.D.7.)

"all internal communications, retained for Your business purposes, in which employees of the Company discussed or mentioned calls originated through the Company's VoIP lines that delivered prerecorded Telemarketing messages." (II.D.8.)

"all internal communications, retained for Your business purposes, in which employees of the Company discussed or mentioned calls originated through the Company's VoIP lines that used spoofed caller ID numbers." (II.D.9.)

"all internal communications, retained for Your business purposes, in which employees of the Company discussed or mentioned calls originated through the Company's VoIP lines that were dialed outside of permissible calling times." (II.D.10.)

"all documents and communications, retained for Your business purposes, related to monitoring, reviewing, or analyzing consumer complaints reported to the Federal Trade Commission." (II.D.12.)

Although XCast has repeatedly sought clarification of these indefinite requests, the FTC has refused to narrow their scope or provide specific identifying information that XCast might be able to use for further records searching, apart from engaging in perfunctory and brief "meet and confer" calls.  (Pennington Decl. ¶¶ 2-10 and Exh. A-E; Nelson Decl. ¶¶ 6 and 12-16.)

XCast's efforts to respond were made in good faith.  XCast has provided what it could and has explained in detail why it cannot produce further responsive records and why certain records do not exist.  (Nelson Decl. ¶ 19; Mathis Decl. ¶¶ 14-26.)

And while the FTC alleges in conclusory fashion that XCast's responses are "severely deficient" or "evasive," it neither explains this assertion nor provides substantive supporting testimony from its witness.  (Pet. ¶¶ 40-42; Pet. Exh. A (Williams Decl.) ¶¶ 23-24.)

### 3.    Specification No. II.E.4

This request asked XCast to "[i]dentify all employees who are involved in receiving and responding to complaints about abusive, fraudulent, or unwanted telephone calls."  (Pet. Exh. B at 30.)

In response, XCast stated:  "Every customer-facing employee is responsible for adhering to the compliance standards," and produced an organization chart indicating such employees by job description.  (Mathis Decl. ¶ 26.)

The FTC has called this response "plainly inadequate" and "incomplete and evasive."  (Pet. ¶¶ 45-46; Pet. Exh. A (Williams Decl.) ¶ 26.) Beyond that, and apart from engaging in perfunctory and brief "meet and confer" calls, the FTC has refused to narrow the request's scope.  (Pennington Decl. ¶¶ 9-10 and Exh. D and E.)

XCast further supplemented its response to No. II.E.4 on September 24, 2021 and is awaiting the FTC's response.  (*Id*. ¶¶ 11-12 and Exh. F thereto.)

## IV.   XCAST IS NOT BARRED BY ANY EXHAUSTION OF ADMINISTRATIVE REMEDIES REQUIREMENT

The FTC's assertion that "XCast failed to exhaust its administrative remedies" refers to the CID witness' right to "file with the Commission a petition for an order by the Commission modifying or setting aside the demand."  (15 USC § 57b-1(f); 16 CFR § 2.10.)  The FTC has misapplied the exhaustion of administrative remedies doctrine.

### A.    No Exhaustion Requirement Exists in Any Statute or Regulation

"Exhaustion requirements may be imposed by statute, regulation, or by the courts. Where Congress enacts exhaustion requirements, courts are not free to add to

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

or subtract from them but should instead simply implement congressional intent.  In the absence of congressional commands, courts apply a common-law-style balancing test for exhaustion."  (Wright & Miller, 33 Fed. Prac. & Proc. Judicial Review § 8363 (2d ed.); *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ["Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs. Nevertheless, even in this field of judicial discretion, appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." (Citations omitted.)].)

A clear example of statutory exhaustion is found in the Prison Litigation Reform Act of 1995 (PLRA), which mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a).  (*See Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 1856 (2016) ["As we have often observed, that language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies."].) Another example is found in the Individuals With Disabilities Act (IDEA), requiring a plaintiff to exhaust statutory hearing procedures before suing a school.  20 U.S.C. § 1415(l); *Student A v. San Fran. U. Sch. Dist.*, 9 F.4th 1079 (9th Cir. 2021).

Some federal agency statutes and regulations do impose express mandatory exhaustion requirements for challenging administrative subpoenas.  For example, where the EEOC or NLRB issues an investigative subpoena pursuant to 29 USC § 161(1), a witness "who intends not to comply <u>shall petition</u> the issuing director to seek its revocation or modification."  (29 CFR § 1601.16 (emphasis added); *EEOC v. Kaiser Found. Hosps.*, 2019 WL 7494905, at *4 (C.D. Cal. 2019), *report and rec. adopted*, 2020 WL 70885 (C.D. Cal. 2020).)

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

The FTC's reliance on *NLRB v. Fresh & Easy Neighborhood Mkt.*, 805 F.3d 1155 (9th Cir. 2015), is misplaced because at root, that case turned on the existence of the same mandatory exhaustion regulation.  (*See EEOC. v. Hennepin Cty.*, 623 F. Supp. 29, 31-32 (D. Minn. 1985) ["Any recipient of an EEOC subpoena who does not intend to comply must petition the EEOC general counsel to revoke or modify the subpoena. 29 C.F.R. § 1601.16(b). A party's failure to attempt this administrative appeal procedure prevents the party from challenging the subpoena, except on constitutional grounds."].)

The FTC can point to no similar statute or regulation imposing a mandatory exhaustion requirement.  None is found within 15 USC § 57b-1 (which authorizes the CID), nor within the implementing regulations, 16 CFR § 2.1, et seq.  At most, these provisions impose a time limit for the filing of a petition to limit or quash the CID, which filing then imposes an automatic stay of the witness' compliance period. (15 USC §57b-1(f); 16 CFR § 2.9.)

## B.    The Court May Not Impose a Prudential Exhaustion Requirement

In the absence of a statutory exhaustion requirement, this Court's exercise of discretion "requires 'appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court.'" (*Sisley v. U.S. Drug Enf't Admin.*, __ F.4th __, 2021 WL 3853049, at *5 (9th Cir. 2021) (citing *McCarthy, supra*, 503 U.S. at 144).)  Moreover, while "exhaustion promotes judicial efficiency" by potentially allowing agencies to correct their errors and by producing a useful record, "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them," and thus have "declined to require exhaustion in some circumstances even where administrative and judicial interests would counsel otherwise."  (*McCarthy* at 146.)

The "prudential" exhaustion doctrine has no application here. "Typically, the judicial doctrine requiring exhaustion of administrative remedies focuses on an

individual's ability to bring a complaint against a federal agency." (*United States v. Mostad*, 760 F. App'x 512, 515 (9th Cir. 2019).)  However, it is not possible for a witness served with a CID to sue the issuing agency to challenge it; instead, the witness must await the agency's petition for enforcement.  (*CFPB v. Seila L. LLC*, 997 F.3d 837, 847-48 (9th Cir. 2021) ["[A] party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it."]; *In re Ramirez*, 905 F.2d 97, 98 (5th Cir. 1990) ["Where an agency must resort to judicial enforcement of its subpoenas, courts generally dismiss anticipatory actions filed by parties challenging such subpoenas as not being ripe for review because of the availability of an adequate remedy at law if, and when, the agency files an enforcement action."].)

Even putting that aside, the circumstances where courts may impose prudential exhaustion requirements are vastly different than the case at hand, as the recent Ninth Circuit ruling in *Sisley* illustrates.  Certain individuals had petitioned the DEA to remove or alter the scheduling of marijuana as a Schedule I substance and, when the DEA denied that petition, sought mandamus review, which was denied.  Other plaintiffs then challenged the DEA ruling in the Ninth Circuit, which held the challenge was barred by the plaintiffs' failure to exhaust administrative remedies under the Controlled Substances Act of 1970 (CSA).  The court reasoned that while the CSA did not include an express exhaustion requirement, one should be recognized because "the text and structure" of the Act showed that Congress "sought to favor administrative decisionmaking" and because requiring exhaustion under the CSA was "consistent with congressional intent."  (*Id*. at *5.)  The CSA tasks the Attorney General with the rulemaking authority for drug scheduling, including "on the petition of any interested party," meaning that Congress had "expressly authorized individuals to petition the DEA—not the courts directly—to schedule, reschedule, or remove a substance."  Further, "the CSA provides for judicial review of final agency action, not judicial decisionmaking in the first

1   instance." (*Id*.)  In light of this statutory scheme, the court held that "[t]o require

2   interested individuals to petition the DEA before seeking judicial review is

3   consistent with—indeed almost demanded by—this carefully established statutory

4   process." (*Id*.)

5          In contrast, the statutory scheme here does not suggest Congress' intent to

6   defer to the FTC's own judgment in the enforcement of its CIDs.  "CIDs are not

7   self-enforcing, and non-compliance triggers no fine or penalty." (*John Doe Co. v.*

8   *Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (addressing

9   CFPB CIDs).)  Instead, the FTC must enforce its investigatory power by way of a

10  petition in the district court, where the witness is afforded a chance to respond, and

11  which are subject to the Federal Rules of Civil Procedure.  (15 USC § 57b-1(e); Pet.

12  p. 4 fn. 3; *Karuk Tribe Housing Auth.*, 260 F.3d at 1076.)  Once in the district court,

13  "the deference courts afford agencies does not 'eviscerate the independent role

14  which the federal courts play in subpoena enforcement proceedings.'" (*CFPB v.*

15  *Accred. Council for Indep. Colleges & Sch.*, 854 F.3d 683, 689 (D.C. Cir. 2017)

16  (citation omitted); *EEOC v. U.S. Fid. & Guar. Co.*, 414 F. Supp. 227, 232 (D. Md.

17  1976) ["The Commission contends that the respondent is barred from raising issues

18  before the Court which it failed to raise in its Petition to Revoke before the

19  Commission. The Commission seeks to bar court consideration of the defenses of

20  relevancy, burdensomeness and delay. ... The difficulty with the Commission's

21  reasoning is that this Court is not functioning as a reviewing court in an action for

22  subpoena enforcement. The Court does not study the record and determine whether

23  the Director of Compliance or the Commission acted properly in refusing to quash a

24  subpoena. A subpoena enforcement proceeding is a de novo proceeding before this

25  Court. Therefore, the Court sees no reason to limit the arguments respondent may

26  raise and will not do so."].)

27         Further, the FTC statute provides for a CID witness to retain the right to

28  preserve objections asserted during the investigation, irrespective of whether the

witness has petitioned to limit or quash the CID.  Where the CID compels oral testimony, the witness or his or her attorney "may object on the record to any question," and objections "may properly be made, received, and entered upon the record when it is claimed that such person is entitled to refuse to answer the question on grounds of any constitutional or other legal right or privilege ...."  (15 USC § 57b-1(c)(14)(D)(2); 16 CFR § 2.9(b)(2).)  This provision belies any argument that Congress intended the FTC to be able to eliminate objections not made by way of a petition filed within 20 days of service.

Finally, even if the Court were to impose a prudential exhaustion requirement, the Court may waive that requirement where "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void."  (*Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 1994).)  Here, it would have been futile for XCast to petition the FTC to limit or quash its CID, given the FTC's unwillingness to clarify the focus of its investigation, and given that the agency has been aggressively pursuing VoIP providers for allegedly facilitating illegal robocalls and publicly touting the success of its efforts.[15]  (*See*, *e.g.*, Pet. p. 3, fn. 2.)

---

[15]    *See* press releases cited in footnotes 1 and 2 above and https://www.ftc.gov/news-events/press-releases/2020/05/ftc-fcc-send-joint-letters-additional-voip-providers-warning.)

**V.      <u>CONCLUSION</u>**

For all the foregoing reasons, Respondent XCast Labs, Inc. respectfully requests that this Court deny the Petition in its entirety.

DATED: September 24, 2021

SMITH, GAMBRELL & RUSSELL, LLP

By:      */s/ Edward A. Pennington*
Edward A. Pennington
Gregg A. Rapoport
Attorneys for Respondent
XCAST LABS, INC.

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND

## **<u>CERTIFICATE OF SERVICE</u>**

1

2        I, Gregg A. Rapoport, am over the age of 18 years and am not a party to this

3   action.  I am an attorney licensed to practice before the bar of this Court.  Upon my

4   oath, I hereby state that on the date set forth below, I caused the foregoing document

5   to be filed electronically, and notice hereof will automatically be sent to all counsel

6   of record that participate in electronic filing, by operation of the Court's electronic

7   filing system.  Parties may access this filing through the Court's system.  In

8   addition, if any attorneys are not participating in electronic filing, they are identified

9   below and have been mailed, via first-class postage, notice hereof on the date this

10  document is being electronically filed.

11       I declare under penalty of perjury that the foregoing is true and correct.

12  Executed on September 24, 2021, at Burbank, California.

13

14                     *s/ Gregg A. Rapoport*
                       Gregg A. Rapoport
15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONDENT'S RESPONSE TO PETITION FOR SUMMARY
ENFORCEMENT OF A CIVIL INVESTIGATIVE DEMAND